[No. A035602. First Dist., Div. Five. May 8, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL WASHINGTON, Defendant and Appellant.

COUNSEL

Gordon S. Brownell, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Stan M. Helfman and Sharon G. Birenbaum, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**LOW, P. J.**—Defendant, Michael Washington, appeals from a probation revocation resulting from a finding that he was in possession of cocaine. (Health & Saf. Code, § 11350.) He was sentenced to three years in state prison. Defendant contends (1) that the evidence used against him at the probation revocation hearing was the product of an illegal detention and (2) that the conduct of the police in detaining defendant was so egregious as to warrant the suppression of that evidence at the hearing. We agree, and reverse.

## I

On May 3, 1986, Officers Lewis and Griffin were in the vicinity of 1232 Buchanan Street. They observed defendant along with four other individuals in a courtyard area between 1133 Laguna and 1232 Buchanan. Defendant and the others were observed talking in a "huddle" formation with "a lot of hand movement" inside the huddle, but the officers could not see what was in the hands of any member of the group. The officers then walked toward the group, at which point everyone looked in the officers direction, whispered, and quickly dispersed. When defendant saw the officers, he immediately turned around and started walking at a fast pace through the lobby of 1232 Buchanan. The officers followed him for a quarter of a block when Officer Griffin called out to defendant. Defendant replied, "Who me?" Officer Griffin answered, "Yes," and defendant immediately ran away. The officers gave chase. Two minutes later, while still chasing defendant, Officer Lewis saw defendant discard a plastic bag con-

taining five white bindles. Officer Lewis scooped up the bag as he continued to give chase. Shortly thereafter, the officers apprehended defendant.

During the probation revocation hearing, Officer Lewis testified that during the four years he had been a patrolman he had made at least 100 arrests concerning cocaine in the area frequented by defendant that night. On cross-examination, Officer Lewis answered in the affirmative when asked if most of the Black men he saw in the area usually had something to hide if they ran from police. The officer stated that prior to the chase he saw no contraband, nor was anything about the group's dispersal significant. Nor did the officer explain why they singled out defendant to follow. The trial court denied defendant's motion to suppress and revoked defendant's probation.

## II

The facts bearing on the legality of the detention in this case were undisputed; therefore it is the responsibility of this court to measure the facts as found by the trial court against constitutional standards. (See *People v. Aldridge* (1984) 35 Cal.3d 473, 477 [198 Cal.Rptr. 538, 674 P.2d 240].) Defendant argues that the actions of the police officers constituted a detention without the factual predicate necessary to support an investigative stop or detention. (See *In re Tony C.* (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957].) Therefore, he asserts the evidence used against him at the probation revocation hearing was the product of an illegal detention and should have been suppressed.

## A

Prior to defendant's abandonment of the cocaine, the police lacked the "articulable suspicion that a person has committed or is about to commit a crime." (*Florida* v. *Royer* (1983) 460 U.S. 491, 498 [75 L.Ed.2d 229, 237, 103 S.Ct. 1319].) The officers spotted the group of men in an open courtyard at 6:15 p.m.; the men made no attempt to conceal themselves and did not exhibit any furtive behavior. The hand gestures were, on the police officer's own testimony, inconclusive and unrevealing. Furthermore, the time at which the detention occurred is not the "late or unusual hour ... from which any inference of criminality may be drawn." (*People* v. *Bower* (1979) 24 Cal.3d 638, 645 [156 Cal.Rptr. 856, 597 P.2d 115].) The fact that defendant was seen in what was a high crime area also does not elevate the facts into a reasonable suspicion of criminality. Courts have been "reluctant to conclude that a location's crime rate transforms otherwise innocent-appearing circumstances into circumstances justifying the seizure of an individual." (*Id.,* at p. 645.)

Once the officers made their approach visible, they gave no justification for their decision to follow defendant apart from the others in the group. Neither officer knew defendant or knew of defendant's past criminal record, nor did Officer Lewis testify that defendant appeared to be a principal or a leader in the group. Further, the defendant had the right to walk away from the officers. He had no legal duty to submit to the attention of the officers; he had the freedom to "go on his way," free of stopping even momentarily for the officers. (See *Florida* v. *Royer, supra,* 460 U.S. at p. 498 [75 L.Ed.2d at p. 236]; *People* v. *Bower, supra,* 24 Cal.3d at p. 648.) By walking at a brisk rate away from the officers, defendant could have been exercising his right to avoid the officers or avoid any other person, or could have simply walked rapidly through sheer nervousness at the sight of a police officer. (*People* v. *Bower, supra,* at pp. 647-648; cf. *People* v. *Moore* (1968) 69 Cal.2d 674, 683 [72 Cal.Rptr. 800, 446 P.2d 800].)

We see no change in the analysis when defendant decided to run from the officers. Flight alone does not trigger an investigative detention; rather, it must be combined with other objective factors that give use to an articulable suspicion of criminal activity. (See *People* v. *Aldridge, supra,* 35 Cal.3d at p. 479.) No such factors existed, nor does Officer Lewis's assertion that the "black men [they] see in the project usually have something to hide when they run" justify a detention. "[M]ere subjective speculation as to the [person's] purported motives ... carries no weight." (*Ibid.*)

Thus, prior to defendant's abandonment of the contraband, the circumstances of defendant's actions were not reasonably consistent with criminal activity (*People* v. *Loewen* (1983) 35 Cal.3d 117, 129 [196 Cal.Rptr. 846, 672 P.2d 436]) whether viewed separately or in their totality.

B

In *Florida* v. *Royer, supra,* 460 U.S. at page 497 [75 L.Ed.2d at page 236], the Supreme Court stated that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen ...." The person approached "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." (At p. 498 [75 L.Ed.2d at p. 236].) The court further stated: "He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. [Citation.] *If there is no detention*—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed." (*Ibid.,* italics added.)

■ Thus, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (*United States* v. *Mendenhall* (1980) 446 U.S. 544, 554 [64 L.Ed.2d 497, 509, 100 S.Ct. 1870].) This standard was approved by plurality in *Royer* and has been adopted by a majority of the court. In *Wilson* v. *Superior Court* (1983) 34 Cal.3d 777 [195 Cal.Rptr. 671, 670 P.2d 325], certiorari denied 466 U.S. 944 [80 L.Ed.2d 474, 104 S.Ct. 1929], the California Supreme Court adopted the *Mendenhall* analysis.

■ In this case, defendant, a Black male, had been confronted by two uniformed police officers. He exercised his right to avoid the officers through rapid walking designed to put distance between the police officers and himself. Instead, the police officers singled him out and began following him down the block. At that point, it would be reasonable for defendant to believe that he was the focus of the officers' particularized (if wholly unreasonable) suspicion. The officers then called out to him, though the words are absent from the record. Defendant broke into a run and the officers followed.

At the moment that the officers gave chase, however, the reasonable belief that the officers wanted to talk with him changed into a definite signal to defendant that he was not free to leave. By chasing defendant, the officers made clear their intention that defendant would not be able to escape contact through running. From the police officer's testimony, the chase had lasted two minutes before any evidence of contraband was revealed. If defendant required further indication of the officer's determination that he was not free to leave, a sustained two-minute chase amply demonstrates that intent.

In *People* v. *Menifee* (1979) 100 Cal.App.3d 235 [160 Cal.Rptr. 682], on similar facts, the Court of Appeal held that the actions of the police officers constituted a *threat* of unlawful detention. *Menifee* was decided before *Mendenhall* and *Royer*; the scope of the seizure alluded to by the *Menifee* court was the actual physical restraint of the suspect's liberty by the officers. As *Mendenhall* and *Royer* state, however, the proper standard focuses on the *reasonability* of the *belief* by the person that he is not free to leave. If a person is approached by a police officer, the person has several choices. First, he may engage in conversation or answer questions put to him by the police officer. (*Florida* v. *Royer, supra,* 460 U.S. at p. 497 [75 L.Ed.2d at p. 236].) Second, the person may stop, indicate his refusal to listen to the officer, or, after the officer questions him, refuse to answer the officer and walk away. (At p. 498 [75 L.Ed.2d at p. 236].) Third, the person may refuse to acknowledge the officer at all and walk away. (*Ibid.*) In either of the

latter two scenarios, the person believes he has a right to walk away. If the officer takes any affirmative action indicating his intention at preventing the person from leaving, the officer is exercising a restraint on the person such that a reasonable person would not feel he is able to leave. Giving chase after an individual in a manner designed to overtake and detain or encourage the individual to give up his flight is a detention. It is an overt manifestation of an officer's authority that restrains the liberty of a citizen. (*Terry* v. *Ohio* (1968) 392 U.S. 1, 19, fn. 16 [20 L.Ed.2d 889, 905, 88 S.Ct. 1868].)

We do not say that whenever an officer follows an individual at a discrete but noticeable distance it constitutes a "seizure"—to do so would paralyze an effective means of law enforcement. Surveillance is an established investigatory technique.[1] But in a chase, as we have here, it becomes indisputable that the officers' actions are meant to stop and detain a fleeing individual.

### III

■ Was defendant's plastic bag containing the bindles the "fruit of the poisonous tree"? In analyzing whether the abandonment breaks the causal connection between the detention and the act of abandonment, courts have examined the facts to determine whether the action was " ' "sufficiently an act of free will." ' " (*Taylor* v. *Alabama* (1982) 457 U.S. 687, 690 [73 L.Ed.2d 314, 319, 102 S.Ct. 2664].) That is, " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' [Citation.]" (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 488 [9 L.Ed.2d 441, 455, 83 S.Ct. 407].)

---

[1] A person under police surveillance will often run to lose the police "tail" (see, e.g., *People* v. *Siegenthaler* (1972) 7 Cal.3d 465 [103 Cal.Rptr. 243, 499 P.2d 499]; *People* v. *Patrick* (1982) 135 Cal.App.3d 290 [185 Cal.Rptr. 325]), and police officers may be forced to run after individuals in order to maintain contact with them; however, the officers may not, in the absence of an articulable suspicion of criminal activity or probable cause, use words, voice, gesture, or other behavior that would indicate to a reasonable person that he is not free to leave.

A special case is posed by plainclothes officers who shadow persons suspected of engaging in criminal activity. In *People* v. *Shabaz* (1985) 424 Mich. 42 [378 N.W.2d 451], defendant " 'took off running' " when plainclothes officers slowed their unmarked car to a halt near defendant. (*Id.*, at p. 453.) The officers then accelerated toward defendant and, when they arrived within 10 to 15 feet of him, one officer leaped out of the car and gave chase. (*Ibid.*) Even though the officers never identified themselves or gave any order or command, it is indisputable that the pursuit was designed to detain defendant, and that a reasonable person would not conclude from such behavior that he was free to leave.

In *People* v. *Wright* (1986) 151 Mich.App. 354 [390 N.W.2d 187], defendant, upon spotting an unmarked police car tailing him, dropped contraband while the officers remained in the car and before they had made any attempt to stop defendant. Thus, the absence of any overt, affirmative acts that would have indicated their intent to detain defendant proved the distinguishing factor from the scenario in *Shabaz*.

In *Brown* v. *Illinois* (1975) 422 U.S. 590 [45 L.Ed.2d 416, 95 S.Ct. 2254], the court stated that the "question whether [an act] is the product of a free will under *Wong Sun* must be answered on the facts of each case. No single fact is dispositive." (At p. 603 [45 L.Ed.2d at p. 427].) The court proceeded to list several factors that are now recognized "tests" for determining the attenuation of an act to the illegal conduct: "The temporal proximity ... , the presence of intervening circumstances [citation], and, particularly, the purpose and flagrancy of the official misconduct are all relevant." (At pp. 603-604 [45 L.Ed.2d at p. 427], fns. omitted; accord *United States* v. *Robinson* (11th Cir. 1982) 690 F.2d 869, 877; *People* v. *Odom* (1980) 83 Ill.App.3d 1022 [404 N.E.2d 997, 1002].)

Applying these factors to the facts before us, we cannot say the abandonment of contraband by defendant was free of the taint of the illegal detention. Two minutes elapsed between the seizure and the abandonment; there were no intervening circumstances. Indeed, because defendant discarded the bindles during the chase, the abandonment occurred while he was illegally seized and there could be no intervening circumstances. Finally, the unsubstantiated suspicions that led the officers to shadow and then seize defendant, for the purpose only of divulging what defendant "had to hide," are an abuse of the police investigatory power. It was an "expedition for evidence in the hope that something might turn up." (*Brown* v. *Illinois, supra,* 422 U.S. at p. 605 [45 L.Ed.2d at p. 428].) Thus, we hold that the "abandonment" of the cocaine was the fruit of the illegal detention.

## IV

A court may exclude evidence only if the exclusion is mandated by the federal exclusionary rule applicable to evidence seized in violation of the Fourth Amendment. (Cal. Const., art. I, § 28, subd. (d); *In re Lance W.* (1985) 37 Cal.3d 873, 896 [210 Cal.Rptr. 631, 694 P.2d 744].) "[T]he exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings ...." *(United States* v. *Calandra* (1974) 414 U.S. 338, 348 [38 L.Ed.2d 561, 571, 94 S.Ct. 613].) It is "neither intended nor able to 'cure the invasion of the defendant's rights which he has already suffered.' " *(United States* v. *Leon* (1984) 468 U.S. 897, 906 [82 L.Ed.2d 677, 687, 104 S.Ct. 3405], quoting *Stone* v. *Powell* (1976) 428 U.S. 465, 540 [49 L.Ed.2d 1067, 1114, 96 S.Ct. 3037].) Rather, the rule operates as a "judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *(United States* v. *Calandra, supra,* at p. 348 [38 L.Ed.2d at p. 571], fn. omitted.) "As with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *(Ibid.)*

 Violations of the Fourth Amendment that transgress notions of fundamental fairness and undermine the probative value of the evidence obtained warrant exclusion. (See *INS* v. *Lopez-Mendoza* (1984) 468 U.S. 1032, 1050-1051 [82 L.Ed.2d 778, 793, 104 S.Ct. 3479]; cf. *Rochin* v. *California* (1952) 342 U.S. 165 [96 L.Ed.183, 72 S.Ct. 205, 25 A.L.R.2d 1396].) Here, the officers conceded they had no objective factors upon which to base any suspicions that the group was involved in illegal activity, and the officers offered no explanation why they singled out defendant to follow. Indeed, the only justification for engaging in pursuit was that defendant was a Black male, and that it was the officer's subjective belief that Black men run from police when they have something to hide. Thus, a single factor—the defendant's race—triggered the detention. This factor is unreasonable (*United States* v. *Brignoni-Ponce* (1975) 422 U.S. 873, 886-887 [45 L.Ed.2d 607, 619, 95 S.Ct. 2574]) and, in our view, triggered the type of police misconduct which offends our " 'sense of justice.' " (*Rochin* v. *California, supra,* 342 U.S. at p. 173 [96 L.Ed. at p. 190].) Such an egregious violation of the Fourth Amendment supports the application of the exclusionary rule. (Cf. *United States* v. *Brown* (5th Cir. 1973) 488 F.2d 94, 95.)

The trial court erred in ruling the evidence admissible for purposes of revoking defendant's probation. Because the admission of the evidence constituted the sole ground for revoking defendant's probation, the order revoking probation should be set aside. However, that does not preclude the court from revoking defendant's probation upon the introduction and proof of evidence independent of the tainted material at issue here.

The judgment is reversed with directions to restore defendant to probation.

King, J., and Haning, J., concurred.

A petition for a rehearing was denied June 5, 1987, and respondent's petition for review by the Supreme Court was denied August 20, 1987.