STATE OF CONNECTICUT *v.* STEPHEN BARNES
(5617)
STATE OF CONNECTICUT *v.* DONALD BRADLEY
(5674)

SPALLONE, NORCOTT and FOTI, Js.

Argued May 20—decision released September 20, 1988

*Barbara J. Sorentino* and *Lauren Weisfield* for the appellants (defendants).

*Timothy J. Sugrue,* deputy assistant state's attorney, with whom, on the brief, was *Roland Fasano,* assistant state's attorney, for the appellee (state).

SPALLONE, J. The defendants, Stephen Barnes and Donald Bradley, appeal from their convictions, following a jury trial, of the crime of aiding the commission of a burglary in the second degree in violation of General Statutes §§ 53a-8 and 53a-102. The cases against the defendants were joined for trial and each has filed a separate appeal. This opinion will serve as our decision in both appeals.

The defendants claim that the trial court erred (1) in denying their motions to dismiss, which alleged an illegal arrest or seizure, and their motions to suppress evidence, identifications and certain statements, alleged to be the fruits of such illegality, (2) in restricting the scope of voir dire during jury selection, (3) in refusing to suppress a witness' pretrial out-of-court identification of the defendants as unnecessarily suggestive or unreliable and by permitting the witness to make an in-court identification of the defendants, and (4) in instructing the jury on the use of inferences, in commenting on the evidence and by reading back to the jury the direct testimony of a state's witness.

The jury could reasonably have found the following facts. In December, 1984, Cynthia Carroll and her roommate shared an apartment on Fountain Street in the Westville section of New Haven. At approximately 1 a.m. on December 26, 1984, Carroll and her fiance,

Glenn Ifill, were engaged in a conversation in the apartment when they heard noises emanating from the living room and, assuming it was Carroll's roommate, called out to her. When no one answered, Ifill walked into the living room where he observed Christmas gifts, which previously had been neatly arranged, scattered about the room. He also noticed that a window overlooking a small courtyard, which had been closed, was open. Ifill then proceeded to the open window and observed two black males in the courtyard, their backs toward him. The men were about seven feet away and appeared to be carrying Christmas gifts and packages. Ifill called out, whereupon both men turned and looked directly at him. They then turned away and ran toward Central Avenue. Ifill jumped from the window, but fell and was unable to give chase. He returned to the apartment and, at his request, Carroll called the police.

At about the same time, Officer James Kelley of the New Haven police department was alone in a marked police cruiser patrolling the Westville area. As Kelley was driving east on Whalley Avenue, he observed two black males laden with Christmas gifts and packages run across Whalley Avenue. The men had come from the direction of Central Avenue and were looking back over their shoulders. After crossing the street, the two men first ran in the direction of the cruiser, then turned and ran into the driveway of a commercial building. Kelley followed the men into the driveway. When the men again looked back toward him, he recognized one of them as the defendant Barnes, a person Kelley knew as "Mousie."

The two men threw down the packages they were carrying and continued running. After Kelley drove as far into the driveway as he was able, he exited his vehicle and watched the men run down an embankment and scale a fence. At that point, having lost sight of the men, Kelly abandoned the squad car and ran back out

to Whalley Avenue. There he regained sight of the defendants as they ran across Whalley Avenue and entered a nearby convenience store. Believing that the two men he had seen running into the store were the same men he had been chasing, Kelley, alone and without backup, entered the store with his gun drawn. Once inside, he saw Barnes and another man, later identified as the defendant Bradley, breathing heavily and sweating.

Kelley detained the defendants until the arrival of Officer Michael Criscuolo some five to ten minutes later. A pat down of each defendant for weapons revealed nothing. The officers then brought the defendants back to the location where the squad car was parked and where the gifts had been discarded. While in the process of gathering the packages, Kelley received notice over the police radio of the burglary complaint that had been filed by Carroll. The officers then transported the defendants, along with the packages, to Fountain Street, arriving about fifteen minutes after the crime had been committed. Following a discussion with Carroll and Ifill, Kelley told them "he had the stuff and the individuals who took it." Upon Kelley's request, Carroll and Ifill went outside where Carroll identified the gifts, now located in the squad car, as those taken from her apartment, and Ifill positively identified the defendants as the men he had seen in the courtyard twenty minutes earlier. As the defendants were being removed, Bradley asked Kelley to lock up Bradley's car which he said was nearby on Tour Avenue. The car was located where Bradley said it would be.

The defendants were subsequently tried to a jury and convicted of the crime of aiding the commission of a burglary in the second degree. From their convictions, they now appeal.

We will first address the defendants' second claim of error, that the trial court erred by restricting the scope of voir dire. We agree and, therefore, conclude that a new trial must be held.

During the voir dire of the first three prospective jurors, counsel for the defendant Bradley asked each of them whether, "for religious or other reasons," the fact that the burglary occurred the day after Christmas would affect their ability to be fair. Prior to the voir dire, the court informed the panel of the date of the burglary, December 26, but not the time, 1 a.m. After two jurors had been seated, and one excused by Barnes' attorney, the state objected to the question about Christmas. The court sustained the state's objection and asserted that defense counsel had "injected" Christmas into the trial. The court ordered her to "just leave Christmas out of it. Let's not get into Christmas or Santa Claus or anything like that. It has nothing to do with the charge." The court posited that because the word "Christmas" did not appear in the information, the crime simply "did not happen at Christmas." The court also stated that it would not permit the voir dire question because it would "arouse people's emotions." Defense counsel urged upon the court the necessity of exploring the topic of Christmas, took exception to the court's ruling and made it clear that, but for the court's blanket prohibition, each potential juror would have been asked the question. Following the court's refusal to allow defense counsel to mention Christmas, defense counsel moved that the state be ordered to refrain from the mention of Christmas or Christmas gifts in the presence of the jury. The motion was denied and an exception was taken.[1] We agree with the

---

[1] In the presence of the jury, the prosecutor and his three witnesses made no fewer than thirty-three references to Christmas, Christmas tree, Christmas tree lights, Christmas gifts and Christmas packages. In addi-

defendants that the trial court erred in limiting the scope of the voir dire to exclude any reference to Christmas.

Our state constitution provides that in all civil and criminal actions tried before a jury, the parties shall have the right to challenge jurors peremptorily, with the number of such challenges to be established by law. Conn. Const., art. I, § 19. In addition, there is a statutory right to a voir dire examination of each prospective juror in a criminal action. See General Statutes §§ 54-82f, 54-82g.[2] It is settled law in Connecticut that "[t]he right to question each juror individually by counsel shall be inviolate." Conn. Const., art. I, § 19; see, e.g., *State* v. *Dolphin,* 203 Conn. 506, 511, 525 A.2d

---

tion, the prosecutor referred to the subject of Christmas thirteen times in its summation, and the court referred to Christmas three times in its marshalling of the evidence during its charge to the jury.

[2] "[General Statutes] Sec. 54-82f. VOIR DIRE EXAMINATION. In any criminal action tried before a jury, either party shall have the right to examine, personally or by his counsel, each juror outside the presence of other prospective jurors as to his qualifications to sit as a juror in the action, or as to his interest, if any, in the subject matter of the action, or as to his relations with the parties thereto. If the judge before whom the examination is held is of the opinion from the examination that any juror would be unable to render a fair and impartial verdict, the juror shall be excused by the judge from any further service upon the panel, or in the action, as the judge determines. The right of such examination shall not be abridged by requiring questions to be put to any juror in writing and submitted in advance of the commencement of said action."

"[General Statutes] Sec. 54-82g. (Formerly Sec. 51-242). PEREMPTORY CHALLENGES IN CRIMINAL PROSECUTION. The accused may challenge peremptorily, in any criminal trial before the superior court for any offense punishable by death, twenty-five jurors; for any offense punishable by imprisonment for life, fifteen jurors; for any offense the punishment for which may be imprisonment for more than one year and for less than life, six jurors; and for any other offense, three jurors. In any criminal trial in which the accused is charged with more than one count on the information or where there is more than one information, the number of challenges is determined by the count carrying the highest maximum punishment. The state, on the trial of any criminal prosecution, may challenge peremptorily the same number of jurors as the accused."

509 (1987); *Lamb* v. *Burns,* 202 Conn. 158, 162, 520 A.2d 190 (1987); *State* v. *Hill,* 196 Conn. 667, 671–72, 495 A.2d 699 (1985); *State* v. *Marsh,* 168 Conn. 520, 521, 362 A.2d 523 (1975). Although the extent of the voir dire rests largely within the discretion of the trial court, and the exercise of such discretion will not constitute reversible error unless it clearly has been abused or harmful prejudice appears to have resulted; *State* v. *Dolphin,* supra, 512; *State* v. *Rogers,* 197 Conn. 314, 318, 497 A.2d 387 (1985); *State* v. *Haskins,* 188 Conn. 432, 447, 450 A.2d 828 (1982); *State* v. *Anthony,* 172 Conn. 172, 176–77, 374 A.2d 156 (1976); nevertheless, in exercising such discretion the court should grant such latitude as is reasonably necessary to accomplish the twofold purpose of voir dire: to permit the trial court to determine whether a prospective juror is qualified to serve, and to aid the parties in exercising their right to peremptory challenges. *State* v. *Rogers,* supra; *State* v. *Haskins,* supra, 446. Therefore, " 'if there is any likelihood that some prejudice is in the juror's mind which will even subconsciously affect his decision of the case, the party who may be adversely affected should be permitted questions designed to uncover that prejudice. This is particularly true with reference to the defendant in a criminal case.' *State* v. *Higgs,* 143 Conn. 138, 142, 120 A.2d 152 (1956)." *State* v. *Rogers,* supra; 318; *State* v. *Fritz,* 204 Conn. 156, 161, 527 A.2d 1157 (1987).

The Christmas holiday is an event that is conspicuously celebrated to a greater or lesser degree throughout this country. Such celebration is manifest in many ways ranging from quiet reflection to overt public jubilation and covering the entire spectrum in between. "Christmas is a national holiday, celebrated by nonobservant Christians and many non-Christians, as well as by believing Christians." *American Civil Liberties Union* v. *St. Charles,* 794 F.2d 265, 271 (7th Cir.), cert.

denied, 479 U.S. 961, 107 S. Ct. 458, 93 L. Ed. 2d 403
(1986). "The joy of Christmas to believing Christians
is inseparable from the salvation of man . . . ." Id.,
273. Christmas is "a significant historical religious
event long celebrated by the Western World." *Lynch
v. Donnelly,* 465 U.S. 668, 680, 104 S. Ct. 1355, 79 L.
Ed. 2d 604 (1984). It is that holiday which is univer-
sally associated with "a friendly community spirit of
good will." Id., 685.

The distinctive air of brotherhood and goodwill is
especially highlighted in the exchange of greetings and
gifts during the Christmas season. The charges in this
case, that the defendants stole Christmas gifts from
under a Christmas tree, may to some be considered
extremely offensive and may color their ability to be
fair, while it may not affect the perspective of others
in any manner. Clearly, however, the potential exists
that a prospective juror, by the very nature of the alle-
gations, may be unable to assess dispassionately the
guilt or innocence of the accused. The very essence of
the voir dire is to unearth any latent bias or prejudice
which may be present in the mind of a juror that would
impact negatively on his or her ability to determine
fairly the issues in a case. The prospective juror's atti-
tude toward Christmas and whether a crime, which
appears to run counter to the Christmas spirit, affects
the juror's ability to hear the case, are reasonable, log-
ical and natural questions to be asked at voir dire. Any
juror who expressed an inability to render a fair and
impartial verdict because of either strong religious feel-
ings about Christmas, or because of an especially strong
sense of outrage at the burglary of Christmas gifts from
under a Christmas tree would have been unqualified
for jury service under General Statutes § 54-82f, and
thus susceptible to being excused for cause by the court.
Further, had the question been allowed, defense counsel
would have been in a position to gauge any hesitation

or reluctance in the juror's responses or detect any inclination in the juror to reach a verdict based on emotional factors. Although a juror's answers may not have risen to a level requiring removal for cause, the information elicited from the juror's responses would have allowed defense counsel an opportunity to exercise intelligently her client's constitutional right peremptorily to challenge potential jurors. The court's order denying this line of questioning abridged the defendants' right to a fair trial and constitutes harmful error. See *State* v. *Fritz,* supra, 165–66; *State* v. *Dolphin,* supra, 516; *State* v. *Hill,* supra, 673.

Although a new trial must be ordered in this case, we will address the defendants' first and third claims of error because of the likelihood that the same issues will arise at the new trial.

In their first claim of error, the defendants contend that they were arrested illegally and, therefore, the trial court should have granted their motions to dismiss and to suppress any evidence or statements resulting therefrom as the fruits of an illegal arrest. We disagree and hold that the actions of Kelley were warranted under the facts and circumstances in this case, and that no illegal arrest occurred.

We note that when Kelley first observed the defendants, they were laden with Christmas gifts and running while looking back over their shoulders. The officer did nothing to prompt the defendants' flight. The sudden appearance of two men running through the area of a city, known for burglaries, heavily laden with Christmas packages and looking back over their shoulders is reasonably likely to provoke suspicion and to justify further investigation. Confronted with such behavior, the police are not required to stand by helplessly because there is no probable cause at that point to support an arrest. See *Adams* v. *Williams,* 407 U.S.

143, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972); *United States* v. *Jones,* 759 F.2d 633, 638 (8th Cir.), cert. denied, 474 U.S. 837, 106 S. Ct. 113, 88 L. Ed. 2d 92 (1985); *People* v. *Washington,* 192 Cal. App. 3d 1120, 236 Cal. Rptr. 840 (1987).

When the defendants realized that Kelley was following them, they threw down the packages, begun to run faster, descended an embankment and scaled a fence, all in an obvious attempt to evade the officer. At this point, Kelley would have been fully justified in detaining the two men on the basis of a reasonable suspicion grounded in specific and articulable facts that they may have been or were about to be involved in a crime. *United States* v. *Hensley,* 469 U.S. 221, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985); *Terry* v. *Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Although Kelley was unable to make a stop at that point, upon his regaining sight of the defendants entering the convenience store, he still possessed good reason to conduct an investigative stop.

After being joined by Criscuolo, the two officers proceeded in accordance with the practice of good police work. They escorted the defendants back to the area where the defendants had discarded the packages. Here, Kelley received word that a burglary involving Christmas packages had taken place. At this point, what had begun as rather questionable behavior, then became suspicious behavior and finally evolved into probable cause to justify an arrest when Kelley learned of the burglary involving Christmas packages. All of this occurred within a few minutes of the commission of the crime and in the same immediate neighborhood.

We hold that the trial court correctly concluded that the initial arrest of the defendants was not illegal. Because the first arrest was legal, the trial court correctly denied the defendants' motions to dismiss and

to suppress. The defendants' actions in this case could not reasonably be explained as innocent behavior. Their actions, which included apparent flight, discarding the packages, furtiveness and evasiveness, were indicative of criminal behavior. See *State* v. *Paoletto,* 181 Conn. 172, 182, 434 A.2d 954 (1980); *State* v. *Rodriguez,* 14 Conn. App. 574, 577–79, 542 A.2d 342 (1988); *State* v. *Williamson,* 10 Conn. App. 532, 540–41, 524 A.2d 655, cert. denied, 204 Conn. 801, 525 A.2d 965 (1987). Here, as in *Rodriguez* and *Williamson,* the police did nothing illegal; the behavior of the defendants was not induced by the police. The defendants' plight resulted from their own wilful commission of incriminating acts justifying first a *Terry* stop, and then a lawful arrest. *Terry* v. *Ohio,* supra. The trial court did not err in denying the defendants' motions to dismiss and to suppress.

Finally, the defendants claim error in the trial court's denial of their motion to suppress Ifill's out-of-court identification which was the result of the earlier show-up. The defendants argue that the one-on-one identification resulted from unnecessarily suggestive police procedure and was unreliable and, therefore, that Ifill's subsequent in-court identification was impermissibly tainted. We disagree.

"The determination of whether an identification procedure offends a defendant's due process rights depends on (1) whether the procedure was impermissibly and unnecessarily suggestive, and (2) if so, whether the identification was nevertheless reliable based on the totality of the circumstances. *State* v. *Pollitt,* 205 Conn. 132, 162, 521 A.2d 125 (1987), and cases cited therein." *State* v. *Bell,* 13 Conn. App. 420, 424, 537 A.2d 496 (1988); see also *State* v. *Sims,* 12 Conn. App. 239, 242, 530 A.2d 1069 (1987). To prevail on their claims, the defendants must show that the trial

court erred in determining both the "suggestiveness" and "reliability" of the identification. *State* v. *Sims,* supra, 242–43.

" 'While a one-on-one confrontation between a victim of a crime and a person whom the police present as a suspect is presumptively suggestive, it does not automatically follow that such a show-up is impermissibly suggestive. *State* v. *Collette,* 199 Conn. 308, 310, 507 A.2d 99 (1986). Prompt on-the-scene confrontations tend under some circumstances to ensure accurate identifications and the benefit of promptness not only aids reliability but permits a quick release of an innocent party if there is no positive identification, allowing the police to resume the investigation with only a minimum of delay. *State* v. *DeJesus,* 7 Conn. App. 309, 315–16, 508 A.2d 463 (1986).' *State* v. *Sims,* [supra, 242]." *State* v. *Bell,* supra, 425.

The show-up in this case occurred only twenty minutes after the burglary was committed. See, e.g., *State* v. *Sims,* supra (thirty-five minutes); *State* v. *Tate,* 9 Conn. App. 141, 143, 516 A.2d 1375 (1986) (less than one hour). The defendants were carrying items that fit the subsequent description of the nature of the items reported stolen. When the officers brought the defendants back to the site where the defendants had discarded the packages, and when the officers learned that a burglary involving Christmas gifts had occurred in the immediate area, it was important that they determine promptly whether the defendants were involved. See, e.g., *State* v. *Collette,* supra, 311; *State* v. *Hamele,* 188 Conn. 372, 378, 449 A.2d 1020 (1982); *State* v. *Sims,* supra, 242; *State* v. *Tate,* supra, 145.

Although Kelley's statement to Ifill to the effect that he had the perpetrators in custody was inappropriate, it did not render the show-up unreliable. A one-on-one show-up, regardless of whether any statements are

made expressing the opinion of the police as to their belief that they have the perpetrators in custody, is inherently suggestive because the police, by presenting a suspect to a victim, are implicitly communicating a belief that they have apprehended the actual perpetrator. See, e.g., *State* v. *Graham,* 13 Conn. App. 554, 561, 538 A.2d 236 (1988). Any communication to the victim expressing the officer's beliefs, because of the very nature of a show-up, is simply redundant. The record furnishes no basis to conclude that Kelley's statement influenced Ifill's identification. See, e.g., id., 561–62. Ifill testified at the trial that his identification of the defendants was based on his own observation of them and was not influenced by Kelley's statements. There is no reason to conclude that Ifill, simply because of Kelley's statement, felt any more pressure to make an identification than the victims in *State* v. *Mitchell,* 204 Conn. 187, 198–99, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987), *State* v. *Foster,* 13 Conn. App. 214, 219–20, 535 A.2d 393 (1988), or *State* v. *Sims,* supra, 242. Under the circumstances of this case, the confrontation between Ifill and the defendants was reasonably necessary and an acceptable and permissible investigative technique. *State* v. *Mitchell,* supra, 199; *State* v. *Sims,* supra. We cannot say that the determination by the trial court that the show-up in this case, although suggestive, was not impermissibly so, was clearly erroneous. Practice Book § 4061.

We decline to address the defendants' fourth claim of error as the circumstances giving rise to these issues are not likely to occur upon retrial.

There is error, the judgments are set aside and the case is remanded for a new trial.

In this opinion the other judges concurred.