Filed 1/28/21  In re K.D. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re K.D., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>K.D.,<br><br>        Defendant and Appellant. | A159192<br><br>(Solano County<br>Super. Ct. No. J44465) |

This appeal arises out of the juvenile court's denial of K.D.'s motion to suppress evidence at a probation revocation hearing.  K.D. contends the court erred by denying his suppression motion, and by relying on illegally obtained evidence in finding he violated probation.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In June 2019, the court adjudged K.D. a ward of the court and placed him on probation.

A.

*Suppression and Probation Revocation Hearing*

A few months later, the prosecution filed a petition alleging K.D. violated his juvenile probation by possessing a firearm and failing to obey the

1

law.  K.D. moved to suppress, arguing he was detained without reasonable suspicion.  At the combined suppression and probation revocation hearing, the parties presented the following evidence:

At 5:00 p.m. on September 3, 2019, Fairfield Police Officer Amanda Graham was driving a marked patrol car near a strip mall in downtown Fairfield.  Graham—who was assigned to the narcotics investigation unit—was in the area because the police department had received complaints about drug trafficking, and about minors purchasing alcohol and tobacco, at the strip mall.  Graham had made arrests at the strip mall "for drug trafficking, drug sales, drug use," and firearm possession.

As Graham drove through the strip mall's parking lot, she saw a late-model Honda pull out of a back alleyway.  It caught Graham's attention because the alleyway was "kind of . . . hidden" and people did not "drive through [it] very often."  There were three teenagers in the car.  Graham thought two teenagers were "Hispanic or white," and that the third teenager, K.D., might have been "Hispanic and African American."  She was "not sure."  K.D. is Black.  Graham made eye contact with the teenagers.  Their eyes widened, as "if they were surprised to see [her]."  The Honda parked hastily.  The young men got out of the car, leaving the windows down, and walked through the parking lot, away from the businesses.

This behavior—driving through an alleyway, pulling into a parking stall quickly, exiting the car and walking away—was "significant" to Graham.  The fact that the teenagers left the windows down "rose [her] suspicion."  Graham believed the car, like many other older model Hondas, might have been stolen.  Graham was suspicious for an additional reason:  she thought the young men might be "trying to distance themselves" from something in the car to avoid getting "contacted or arrested with it."

The young men walked around the corner.  Graham got out of her patrol car and inspected the Honda.  She was looking for an indication the car was stolen.  Nothing seemed out of the ordinary, and a records check did not indicate the car was stolen.  So Graham got back in her car and drove out of the parking lot.  As she drove, she saw the teenagers standing in front of a liquor store.  She pulled into a nearby lot and waited for the teenagers to leave the store.  The teenagers had not done anything illegal, but Graham wanted to talk to them.  A few minutes later, the Honda emerged from the alleyway.  The teenagers looked over in Graham's direction.  Then the Honda made a quick right turn out of the alleyway and accelerated.

The driver made eye contact with Graham, then immediately stopped the Honda.  As the car came to a stop, Graham saw K.D.—who was in the front passenger seat—reach down toward the floorboard area.  Based on her training and experience, Graham knew people commonly concealed "weapons and/or firearms or drugs" in that area.  She did not know whether K.D. "was concealing something or retrieving something to harm [her]."  Then K.D. got out of the car, which made Graham concerned for her safety.  The driver began to get out of the Honda, too.  At that point, Graham ordered the teenagers to stay in the car.  She pulled her patrol car behind the Honda and turned on her spotlight.  She did not recall drawing her service weapon.

Graham approached the car.  When she reached the passenger window, she noticed the teenagers were nervous and fidgety, and that the car smelled of "processed marijuana."  After other officers arrived, Graham removed the occupants from the car, one by one, and handcuffed them.  She did this because she thought the teenagers had something illegal—drugs or a gun—in the car.  Graham wanted the teenagers out of the car so they could not harm her or her partners.

Graham started with the passenger in the back seat, B.M. She removed B.M. from the car, handcuffed and pat searched him, and had him sit on the curb. Then Graham removed K.D. from the car using a "control hold": at Graham's request, K.D. placed both hands on top of his head, then stuck out the hand closest to Graham. Graham placed that hand in a "twist lock" with "no pressure or force." After K.D. was out of the car, Graham put K.D.'s hands behind his back. Graham checked K.D.'s waistband for weapons, handcuffed K.D., and had him sit on the curb. Finally, Graham took the driver out of the car.

Police officers searched the car. An officer found a small "nugget of weed" in the passenger door and a loaded gun under the passenger seat. After *Mirandizing* K.D.,[1] Graham asked K.D. about the gun. K.D. said the gun did not belong to him but acknowledged knowing it was under the seat. He admitted his DNA would be found on the gun. B.M. told Graham the gun belonged to K.D. He also said K.D. asked him to hide it as Graham pulled up behind the Honda. K.D. tried to pass the gun back to B.M. He pushed the gun away; K.D. hid the gun under the front passenger seat.[2]

B.

*Supplemental Briefing and the Court's Ruling*

At the conclusion of the hearing, the court noted that the parties had not briefed whether Graham's conduct shocked the conscience, the standard required to suppress evidence at a probation revocation hearing. The court

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436.

[2] At the hearing, B.M. testified he was waking up from a nap when Graham approached the Honda. She pulled him out of the car, "threw [him] right to the curb," and handcuffed him "for no reason." B.M. testified that he told Graham he did not see a gun in the car. He also denied telling Graham the gun belonged to K.D.

4

invited the parties to discuss that issue. In response, the prosecution stated there was no evidence Graham's conduct was shocking: it characterized the traffic stop as routine, and supported by reasonable suspicion. Defense counsel disagreed, arguing Graham's conduct shocked the conscience because she detained the Honda, and removed the teenagers from the car and handcuffed them, without seeing "them do anything illegal."

The court asked the parties to file supplemental briefs on whether Graham's conduct shocked the conscience. K.D.'s supplemental brief argued Graham's conduct shocked the conscience because she detained the car without reasonable suspicion. The prosecution countered that Graham had reasonable suspicion to detain the car, and noted there was no evidence Graham singled out the teenagers based on their race, nor any evidence she engaged in the type of racial discrimination necessary to shock the conscience.

After considering the supplemental briefing, the court denied the motion to suppress and determined K.D. violated probation. It continued wardship and probation.

## DISCUSSION

K.D. contends the court erred by denying his suppression motion. He claims the traffic stop was the result of racial profiling, not reasonable suspicion, and that Graham's racial bias, along with her needlessly aggressive conduct in removing him from the car, shocks the conscience and warrants exclusion of the evidence obtained during the detention.

We assume that Graham lacked reasonable suspicion to detain the car, and that the gun and K.D.'s statements were the product of that illegal detention. But as we explain below, we conclude the evidence was nonetheless admissible to establish a probation violation because, under the

5

governing standard, Graham's conduct does not shock the conscience, nor offend our sense of justice.

## I.

### *General Principles*

"In reviewing a suppression motion, the trial court is vested with the power to assess witness credibility, resolve evidentiary conflicts, weigh the evidence, and draw factual inferences; its findings are upheld on appeal so long as they are supported by substantial evidence. [Citation.] However, we exercise our independent judgment in determining whether on these facts the challenged search or seizure complied with the Fourth Amendment." (*In re Edgerrin J.* (2020) 57 Cal.App.5th 752, 759.)

A defendant may move to suppress evidence obtained through a warrantless search or seizure. (Pen. Code, § 1538.5, subd. (a)(1)(A), (2).) Although Penal Code section 1538.5 is "the exclusive procedure by which a defendant may seek suppression of evidence obtained in a search or seizure that violates 'state constitutional standards,' a court may exclude the evidence on that basis only if exclusion is also mandated by the federal exclusionary rule applicable to evidence seized in violation of the Fourth Amendment." (*In re Lance W.* (1985) 37 Cal.3d 873, 896; *People v. Lazlo* (2012) 206 Cal.App.4th 1063, 1069–1070.)

In probation revocation proceedings, the Fourth Amendment typically does not compel exclusion of evidence, even if it was the fruit of an unlawful search or seizure. (*People v. Coleman* (1975) 13 Cal.3d 867, 876–877, fn. 8 [revocation of probation " 'is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply,' " including the Fourth Amendment exclusionary rule]; *People v. Harrison*

(1988) 199 Cal.App.3d 803, 811 ["federal law does not require application of the exclusionary rule to probation revocation hearings"].)

At a probation revocation hearing, to warrant suppression of evidence in violation of the federal Constitution, the police conduct must be " 'so egregious as to offend "the 'traditions and [collective] conscience of our people' " . . . or to "shock the conscience." ' " (*People v. Howard* (1984) 162 Cal.App.3d 8, 21–22.)  This standard exists, in part, because the exclusionary rule is a " 'judicially created means of deterring illegal searches and seizures.  [Citation.]  As such, the rule . . . applies only in contexts "where its remedial objectives are thought most efficaciously served," ' " i.e., " 'only where its deterrence benefits outweigh its "substantial social costs," ' " a principle this court relied on in *People v. Lazlo*, *supra,* 206 Cal.App.4th at page 1070.

Courts have held that any "minimal deterrent effect" of applying the exclusionary rule at a probation revocation hearing is "significantly outweighed by [the] potential damage to the probation system." (*People v. Nixon* (1982) 131 Cal.App.3d 687, 691–692 (*Nixon*); *People v. Harrison, supra,* 199 Cal.App.3d at p. 811.)  As the *Nixon* court explained, "[t]he purpose of probation conditions is to enhance the chance for rehabilitation while simultaneously affording society a measure of protection.  Because violation of probation conditions may indicate the probationer is not ready or is incapable of rehabilitation by integration into society, it is extremely important that all reliable evidence shedding light on the probationer's conduct be available during probation revocation proceedings." (*Nixon*, at pp. 691–692, fn. omitted; *Pennsylvania Bd. of Probation & Parole v. Scott* (1998) 524 U.S. 357, 363–364 (dis. opn. of J. White) [minimal deterrence

7

benefits of applying exclusionary rule at parole revocation hearing were outweighed by high costs of excluding "reliable, probative evidence"].)

## II.

### *The Officer's Conduct Does Not Shock the Conscience, Nor Offend Our Sense of Justice*

As discussed above, when a suppression motion is made at a probation revocation hearing, the exclusionary rule does not apply unless the police conduct shocks the conscience or offends a sense of justice. For example, in *Nixon*, police officers stopped the defendant's car, which was the same color as a car involved in a burglary. (*Nixon*, *supra*, 131 Cal.App.3d at p. 690.) The police searched the vehicle, found the defendant's nunchakus, and arrested him. (*Ibid*.) At the defendant's probation revocation hearing, the prosecution conceded the police conduct violated the Fourth Amendment, but the trial court admitted the evidence anyway. (*Nixon*, at pp. 690, 692.) The appellate court affirmed, noting the trial court determined "the police conduct was not so egregious as to shock the conscience," and that this conclusion was supported by the evidence. (*Id.* at pp. 693–694.)

Other courts have reached similar results, holding an illegal search or seizure, without more, does not shock the conscience. (*People v. Fuller* (1983) 148 Cal.App.3d 257, 262 [search unsupported by probable cause "may . . . have been illegal" but was "not conducted in so objectionable a manner as to render" the evidence seized inadmissible at probation revocation hearing]; *People v. Harrison, supra,* 199 Cal.App.3d at p. 812 [speculation that officers fabricated probable cause to arrest did not warrant exclusion of evidence at probation revocation proceeding]; *People v. Hayko* (1970) 7 Cal.App.3d 604, 610 [police officers' violation of knock-announce statute did not " 'shock the conscience' "].)

8

But when an officer detains a suspect solely based on race, such an egregious Fourth Amendment violation offends a collective " ' "sense of justice." ' " (*People v. Washington* (1987) 192 Cal.App.3d 1120, 1128 (*Washington*). In *Washington*, officers saw several people—including the defendant—huddled together in an area where numerous drug arrests had been made. (*Id.* at pp. 1122–1123.) When the officers approached, the group quickly dispersed; the officers followed the defendant, a Black man, who began to run. (*Ibid.*) As he ran, the defendant dropped a bag of drugs. The prosecution moved to revoke his probation. The trial court denied the defendant's suppression motion and revoked probation. (*Ibid.*)

This court reversed. We held the officers lacked reasonable suspicion to detain the defendant, noting that the only reason the testifying officer gave for pursuing the defendant was that "most . . . Black men" in that area "usually had something to hide if they ran." (*Washington, supra,* 192 Cal.App.3d at p. 1123.) As we explained, "the officers conceded they had no objective factors upon which to base any suspicions that the group was involved in illegal activity, and the officers offered no explanation why they singled out defendant to follow. Indeed, the only justification for engaging in pursuit was that defendant was a Black male, and that it was the officer's subjective belief that Black men run from police when they have something to hide. Thus, a single factor—the defendant's race—triggered the detention. This factor is unreasonable . . . and, in our view, triggered the type of police misconduct which offends our ' "sense of justice." ' " (*Id.* at p. 1128.) We held the egregious Fourth Amendment violation supported "application of the exclusionary rule" at the probation revocation hearing. (*Washington,* at p. 1128.)

The rule articulated in *Washington*—that detaining a citizen based solely on race offends our sense of justice and justifies the suppression of evidence at a probation revocation hearing—remains good law. But this case bears little resemblance to *Washington*, where the officer admitted his sole reason for detaining the defendant was that "most . . . Black men" in that area "usually had something to hide if they ran." (*Washington, supra,* 192 Cal.App.3d at p. 1123.) And Graham did not single K.D. out from his peers like the officer in *Washington.*

Graham testified the Honda drove through a hidden alleyway in a high-crime area and parked hastily after seeing her patrol vehicle. The teenagers left the car quickly, leaving the windows down. At this point, Graham thought the car might be stolen, or that it contained something illegal. Graham found nothing out of the ordinary when she inspected the car, but she decided to continue watching the teenagers. The teenagers returned to the car and drove away. Then, when they saw Graham, the car came to an abrupt stop, and K.D. reached down to the floorboard, an area Graham knew was often used to conceal weapons and drugs.

While this evidence may not amount to reasonable suspicion, it does not compel a conclusion that the *only* reason Graham detained K.D. was, as he claims, based on his skin color. When the lower court ruled on the suppression motion, it was aware of the correct legal standard and the *Washington* case. In denying the motion, the court made an implied finding that Graham did *not* engage in racial profiling. (*People v. Weaver* (2001) 26 Cal.4th 876, 924.) We cannot disturb this finding on appeal, particularly in the absence of specific evidence of racial motivation or a credibility finding suggesting such a motivation. We cannot, as K.D. requests, "presume" his detention was the result of racial bias in the first instance. Where, as here,

10

a "trial court's conclusions on a Fourth Amendment issue turn on issues of fact and credibility of witnesses, this court may not reweigh the evidence or draw inferences other than those reasonably drawn by the trial court, or substitute its own deductions for those of the trial court, if two or more inferences can reasonably be drawn from the facts." (*People v. Lewis* (1982) 133 Cal.App.3d 317, 323.)

K.D. claims Graham was "brutal" and "aggressive" when she removed him from the car and suggests this "misconduct" shocks the conscience. Law enforcement's unnecessary use of physical force against a defendant during a search or seizure may shock the conscience. (*Rochin v. California* (1952) 342 U.S. 165, 172 [forcibly opening defendant's bedroom door, attempting to extract capsules from his mouth, and directing doctors to pump defendant's stomach against his will shocked the conscience].) But here, the court impliedly concluded Graham was not unnecessarily forceful, and that finding is supported by substantial evidence. The record is devoid of evidence that Graham harassed or physically mistreated K.D. To the contrary, the evidence introduced at the hearing established Graham removed and handcuffed K.D. using no unnecessary "pressure or force" and that she "sat" him on the curb. On this record, we cannot conclude Graham's conduct shocks the conscience or offends our sense of justice. (*People v. Lewis, supra,* 133 Cal.App.3d at p. 323.)

Courts must be vigilant on issues of racial profiling and excessive force. We would not hesitate to order the suppression of evidence obtained by either means. We trust that our colleagues in the trial court are equally resolved. But where the evidence does not substantiate either and where the trial court

11

judge, who observed the presentation of that evidence, made no findings of either, we decline to do so in the first instance.

DISPOSITION

The judgment is affirmed.

                                            _____

                                            Reardon, J.*

WE CONCUR:

_____

Simons, Acting P.J.

_____

Needham, J.

A159192

---

\* Judge of the Superior Court of Alameda County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.