STATE OF CONNECTICUT *v.* RUPERTO LUGO
(SC 16553)

Sullivan, C. J., and Borden, Palmer, Vertefeuille and Zarella, Js.

---

Argued January 15—officially released December 9, 2003

*Suzanne Zitser*, assistant public defender, for the appellant (defendant).

*Nancy L. Chupak*, assistant state's attorney, with whom, on the brief, were *Walter D. Flanagan*, state's attorney, and *Devin T. Stilson*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. The defendant, Ruperto Lugo, was convicted,[1] after a jury trial, of felony murder in violation

---

[1] Although the defendant was charged with conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (2) and 53a-48, the jury found the defendant not guilty of that particular offense.

of General Statutes § 53a-54c,[2] attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (2)[3] and 53a-49 (a),[4] carrying a pistol without a permit in violation of General Statutes (Rev. to 1999) § 29-35 (a),[5] and having a weapon in a vehicle in violation of General Statutes (Rev. to 1999) § 29-38.[6]

---

[2] General Statutes § 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery . . . in the course of and in furtherance of such crime or of flight therefrom, he . . . causes the death of a person other than one of the participants . . . ."

[3] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ."

General Statutes § 53a-133 provides in relevant part: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

[4] General Statutes § 53a-49 (a) provides: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[5] General Statutes (Rev. to 1999) § 29-35 (a) provides in relevant part: "No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28. . . ."

[6] General Statutes (Rev. to 1999) § 29-38 provides in relevant part: "Any person who knowingly has, in any vehicle owned, operated or occupied by him, any weapon for which a proper permit has not been issued as provided in section 29-28 or section 53-206, or has not registered such weapon as required by section 53-202, as the case may be, shall be fined not more than one thousand dollars or imprisoned not more than five years or both, and the presence of any such weapon in any vehicle shall be prima facie evidence of a violation of this section by the owner, operator and each occupant thereof. . . ."

The defendant was sentenced to a total effective term of fifty years imprisonment and ten years of special parole. On appeal, the defendant contends that the trial court improperly: (1) restricted the scope of questioning during voir dire examination in violation of his rights under the sixth and fourteenth amendments to the United States constitution,[7] and under the constitution of Connecticut, article first, § 8,[8] and article first, § 19, as amended by article four of the amendments;[9] (2) excluded relevant evidence regarding the defendant's state of mind in violation of his right to a fair trial; and (3) restricted the defendant's cross-examination of one of the state's witnesses in violation of his right to present a defense under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. We reject each of these claims and, therefore, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In the early evening of July 10, 1999, Barbara

[7] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."

The sixth amendment right to an impartial jury is made applicable to the states through the fourteenth amendment of the United States constitution. *Ristaino* v. *Ross*, 424 U.S. 589, 595 n.6, 96 S. Ct. 1017, 47 L. Ed. 2d 258 (1976).

[8] Article first, § 8, of the Connecticut constitution provides in relevant part: "[T]he accused shall have a right . . . in all prosecutions by indictment or information, to a speedy, public trial by an impartial jury. . . ."

[9] Article first, § 19, of the Connecticut constitution, as amended by article four of the amendments, provides in relevant part: "In all . . . criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. The right to question each juror individually by counsel shall be inviolate."

The defendant also relies on General Statutes § 54-82f, which provides in relevant part: "In any criminal action tried before a jury, either party shall have the right to examine, personally or by his counsel, each juror outside the presence of other prospective jurors as to his qualifications to sit as a juror in the action, or as to his interest, if any, in the subject matter of the action, or as to his relations with the parties thereto. . . ."

Carleton, Mary Pires, Alexis Barnett and the defendant, were driving around Bridgeport discussing plans to drive to Newtown. Prior to leaving Bridgeport, the group picked up Alejandro Melendez,[10] a friend of the defendant. Before Melendez got into the car, the defendant asked him if he "was down for robbing some niggers?"[11] Melendez responded affirmatively and joined the group. During the trip, the defendant took a gun owned by Melendez and placed it on the floor of the car, behind the glove compartment.

After arriving in Newtown, the group encountered a group of three boys, Matt Haight, Brandon Jossick, and the victim, Jason Gowdy, all of whom Pires recognized. As they drove toward the boys, Pires warned the group to "watch out" because one of the boys supposedly was a member of the Latin Kings gang. Thereafter, the defendant retrieved the gun and placed it in his waistband and under his shirt. Pires then exited the vehicle and talked with the boys. After Pires returned to the vehicle, the defendant exited the vehicle and approached the boys. After the defendant asked the boys several questions, the defendant and the victim stood face-to-face. The defendant indicated to the victim that he was carrying a gun. The victim responded by stating, "What? You gonna shoot me? Then shoot me . . . ." The victim then represented to the defendant that he was a member of the Latin Kings and that if he shot him, there would be consequences. The defendant then ordered the victim to "run [his] chain," or, in other words, give him the necklace that he was

---

[10] Melendez was the defendant's codefendant at trial and was charged with the same offenses as the defendant. The jury found Melendez guilty of the crimes of carrying a weapon without a permit and having a weapon in a vehicle.

[11] At trial, the defendant denied making this exact statement and testified that he told Melendez that they were going "to beat some white boys." More than one witness testified, however, that the defendant had asked if Melendez was "down for robbing" someone.

wearing. A scuffle ensued between the defendant and the victim during which the defendant fired two bullets into the victim's head. The defendant returned to the vehicle and directed Carleton to drive away. Paramedics subsequently transported the victim to Danbury Hospital where he was pronounced dead.

The group eventually returned to Bridgeport. The morning after the shooting, the defendant informed Carleton that he was leaving Connecticut for Pennsylvania. The defendant subsequently was arrested in New Haven before he departed for Pennsylvania.

I

The defendant first claims that the trial court improperly restricted the scope of defense counsel's examination of prospective jurors by precluding him from asking them about their knowledge of the Latin Kings. Consequently, the defendant claims, he was deprived of his rights under the sixth and fourteenth amendments to the United States constitution, and the Connecticut constitution, article first, § 8, and article first, § 19, as amended by article four of the amendments. See footnotes 7 through 9 of this opinion. The defendant argues that the victim's status as a member of the Latin Kings was integral to his defense that he never possessed the requisite intent to commit the crime of attempted robbery in the first degree. According to the defendant, because Pires had warned him immediately prior to the shooting that the victim was a member of the Latin Kings, he armed himself prior to exiting the car for the purpose of protecting himself rather than for the purpose of committing a robbery. Thus, the defendant claims that he "should have been allowed to uncover potential bias for or against gangs and specifically the Latin Kings." The defendant claims further that "there was a possibility that a juror might have had relatives that were members of the Latin Kings or another gang

and [have] had certain preconceived ideas that might have influenced whether the defendant wished to exercise a peremptory challenge . . . ." Accordingly, the defendant contends that, because the victim's status as a Latin King was a relevant issue in the case, the trial court's decision to restrict voir dire questioning on that issue constituted an abuse of discretion and resulted in a violation of the defendant's constitutional rights.

The following additional facts are necessary to our resolution of this issue. During voir dire, defense counsel asked the second prospective juror[12] the following questions: (1) "Have you ever heard the term 'Latin King'?" (2) "If there were some indication of gang membership by anybody involved in this case, would that affect you at all?" (3) "[Y]ou could just deal with those people, that person, or that information, just as you would anyone else?" The prospective juror answered "no" to the first two questions and affirmatively to the third question.

Thereafter, outside the presence of the prospective jurors, the trial court instructed defense counsel regarding the appropriate scope of voir dire questioning.[13] The

---

[12] The trial court excused the first prospective juror from jury service.

[13] The following colloquy took place between the trial court and defense counsel:

"The Court: . . . I will ask counsel to avoid questions that seek an advance preview or a preliminary showing about how a juror's going to react to any particular piece of evidence. For example, [defense counsel], you asked one of these jurors about the Latin Kings. And I don't know that anybody connected to this case . . . was a Latin King. I don't know whether that's relevant or whether that's appropriate and I can't know that until some evidence gets put on. And it's kind of planting a seed in advance. And obviously the charges are what they are; you know there are allegations that weapons are involved. But I don't think it's appropriate to try to get an advanced ruling about how a juror's going to react to a particular fact. . . .

"[Defense Counsel]: Yes, Your Honor, if I could just be heard on that specific point. I think it is important that we ask that question. We've obviously all gone through a probable cause hearing. That clearly is going to come up. We could have a situation here where we have a juror who is a Latin King for all we know. It may—you know, it could be quite crucial. So again, I understand the court's restriction about not announcing evidence.

court noted that it was improper to elicit a prospective juror's reaction to a particular piece of evidence through voir dire questioning and, thus, instructed counsel to avoid questions concerning the Latin Kings. Defense counsel objected, claiming that, on the basis of the information revealed at the probable cause hearing, it was crucial to determine a prospective juror's attitude toward the Latin Kings or gangs in general. The trial court reiterated that, in its view, defense counsel's proposed question was an inappropriate attempt to elicit the prospective juror's reaction to the potential evidence concerning the victim's status as a member of the Latin Kings. In addition, the trial court assured defense counsel that if evidence were adduced at trial that indicated that the Latin Kings somehow were involved in

---

And certainly I did my best not to say who would be involved in that, just brought up the general term. But I would claim a right to find out about that, Your Honor. If somebody's going to react—and I would think the state would want to know that too. If somebody's going to react to that term or to some sort of gang membership in a very negative, violent manner, I think we need to know that right up front.

"The Court: Well, I didn't sit on the probable cause hearing and I don't know what the evidence was at the probable cause hearing and I don't know what the potential evidence is going to be—all the potential evidence is going to be at trial. And I just think that the question you asked is really trying to get a preview of how somebody is going to react. And all I can tell you is that if it comes out at trial that the Latin Kings are somehow connected with this, and if it's appropriate for that to be in evidence, then I will give the appropriate cautionary instruction that jurors make their decision based on evidence . . . .

\* \* \*

"[Defense Counsel]: Yes, Your Honor. I'm going to inquire into the scope of the court's ruling. Is the court directing me not to ask that question of any future potential jurors?

\* \* \*

"[The Court]: Okay. . . . I'm not going to permit you to ask questions about the juror's knowledge of the Latin Kings or how he might react to the evidence. If and when such evidence comes in, I'll rule on it. If necessary, I'll give a cautionary instruction. I don't think it's proper to ask the jurors to give an advance ruling on or an advance indication on how they're going to react to evidence in the case. So, you asked me if you're permitted to ask that question. The answer's no."

the case, the court would give the jurors a cautionary instruction regarding their duty to decide the case on the basis of the evidence. Defense counsel then inquired as to whether the court was precluding him from posing that question to any subsequent prospective juror. The court responded, "I'm not going to permit you to ask questions about the juror's knowledge of the Latin Kings or how [the juror] might react to the evidence. . . . So, you asked me if you're permitted to ask that question. The answer's no."[14]

"We have stated that, as a practical matter, the wide range of cases submitted to juries, along with the attendant impossibility of establishing a set pattern of voir dire questions, requires that the trial court be vested with broad discretion in determining the extent of the voir dire examination. See *State* v. *Hernandez*, 204 Conn. 377, 381, 528 A.2d 794 (1987); *State* v. *Dolphin*, 203 Conn. 506, 511–12, 525 A.2d 509 (1987)." *State* v. *Pollitt*, 205 Conn. 61, 73–74, 530 A.2d 155 (1987). "[I]n exercising its discretion, the court should grant such latitude as is reasonably necessary to accomplish the twofold purpose of voir dire: to permit the trial court to determine whether a prospective juror is qualified to serve, and to aid the parties in exercising their right to peremptory challenges." (Internal quotation marks omitted.) *State* v. *Skipper*, 228 Conn. 610, 625, 637 A.2d 1101 (1994). It is well settled that "the court's rulings . . . will not be disturbed unless the court has clearly abused its discretion or it appears that prejudice to one of the parties has resulted. *State* v. *Dahlgren*, 200 Conn. 586, 601, 512 A.2d 906 (1986); *State* v. *Rogers*, 197 Conn. 314, 318, 497 A.2d 387 (1985)." *State* v. *Pollitt*, supra, 74.

"[I]f there is any likelihood that some prejudice is in the juror's mind which will even subconsciously affect

---

[14] Defense counsel then indicated for the record that he would not ask that question but that he would have asked that question in the absence of the court's ruling.

his decision of the case, the party who may be adversely affected should be permitted questions designed to uncover that prejudice. . . . *State* v. *Higgs*, 143 Conn. 138, 142, 120 A.2d 152 (1956); see also *State* v. *Rogers*, [supra, 197 Conn. 318]. The latitude . . . afforded the parties in order that they may accomplish the purposes of the voir dire [however] is tempered by the rule that [q]uestions addressed to prospective jurors involving assumptions or hypotheses concerning the evidence which may be offered at the trial . . . should be discouraged . . . . [A]ll too frequently such inquiries represent a calculated effort on the part of counsel to ascertain before the trial starts what the reaction of the venire[person] will be to certain issues of fact or law or, at least, to implant in his mind a prejudice or prejudgment on those issues. Such an effort transcends the proper limits of the voir dire and represents an abuse of the statutory right of examination. *State* v. *Mendill*, 141 Conn. 360, 362–63, 106 A.2d 178 (1954); see also *State* v. *Clark*, 164 Conn. 224, 226, 319 A.2d 398 (1973)." (Internal quotation marks omitted.) *State* v. *Pollitt*, supra, 205 Conn. 74–75.

We begin our analysis by determining the scope of the trial court's ruling, i.e., what specific question or questions actually were prohibited. The defendant contends that the trial court completely prohibited any questioning on the subject of gangs, Latin Kings or otherwise. We disagree. In our view, it is quite clear from the record that the trial court precluded defense counsel only from asking questions concerning the Latin Kings, but that questions concerning gangs in general were not prohibited or even addressed by the trial court.

First, as we previously have noted, defense counsel posed three gang related questions to a prospective juror, one of which specifically addressed the term "Latin King," prior to the trial court's ruling. Thereafter, outside the presence of the prospective jurors, the trial

court expressed disapproval with defense counsel's question about the Latin Kings and specifically instructed defense counsel not to inquire about the prospective jurors' views on the Latin Kings. In response, defense counsel emphasized the "impor-tan[ce]" of being able to ask "*that question*" and reminded the court that the Latin Kings issue likely would arise at trial. (Emphasis added.) We acknowledge that, at some point during the discussion, defense counsel mentioned the importance of determining how jurors might react to the Latin Kings or gangs in general. Any ambiguity this may have created as to the scope of the court's ruling, however, was dispelled once the court clarified its ruling. The court specifically stated: "[This court is] not going to permit you to ask questions about the juror's knowledge of the Latin Kings or how [the juror] might react to the evidence. . . . So, you asked me if you're permitted to ask *that question.* The answer's no." (Emphasis added.) It is clear, on the basis of the discussion between the trial court and defense counsel, that the trial court was addressing defense counsel's question regarding the Latin Kings only and that its directive on the scope of questions during voir dire of the prospective jurors was limited to defense counsel's specific attempt to elicit the jurors' views on the Latin Kings.

In addition, it is the appellant's duty to provide this court with an adequate record for review. Practice Book § 61-10; *Niehaus* v. *Cowles Business Media, Inc.*, 263 Conn. 178, 183, 819 A.2d 765 (2003). Therefore, if defense counsel believed that the trial court's ruling was unclear, it was defense counsel's obligation to seek further clarification. Because defense counsel did not seek to clarify whether he was precluded from asking *any* questions concerning the subject matter of gangs, we analyze this issue in light of our determination that the trial court's directive on the scope of voir dire ques-

tioning extended to questions concerning the Latin Kings only and not to gangs in general.

The defendant relies primarily on *State* v. *Barnes*, 16 Conn. App. 333, 547 A.2d 584 (1988), and *People* v. *Strain*, 194 Ill. 2d 467, 742 N.E.2d 315 (2000), to support his contention that the trial court abused its discretion in this case. Both cases are distinguishable from the present case, however.

In *Barnes*, the defendants, Stephen Barnes and Donald Bradley, were charged with stealing gifts from under a Christmas tree. *State* v. *Barnes*, supra, 16 Conn. App. 340. During voir dire examination, the trial court precluded defense counsel from asking any questions associated with the topic of Christmas because, in the court's view, it had "nothing to do with the charge" and simply "would arouse people's emotions." (Internal quotation marks omitted.) Id., 337. The Appellate Court reversed the judgment of the trial court, however, holding that the trial court improperly restricted the scope of voir dire, thereby abridging the defendants' right to a fair trial. See id., 341, 345. According to the Appellate Court, "[t]he prospective juror's attitude toward Christmas and whether a crime, which appears to run counter to the Christmas spirit, affects the juror's ability to hear the case, are reasonable, logical and natural questions to be asked at voir dire. . . . [H]ad the question been allowed, defense counsel would have been in a position to gauge any hesitation or reluctance in the juror's responses or detect any inclination in the juror to reach a verdict based on emotional factors." Id., 340–41. Because the purpose of voir dire is to uncover any bias or prejudice that may exist in the mind of the prospective juror, the Appellate Court concluded that the trial court improperly restricted the scope of voir dire. See id., 341.

On the basis of our determination that the trial court in the present case did not preclude defense counsel

from asking questions on the subject matter of gangs in general but, rather, precluded defense counsel from asking questions specifically concerning the Latin Kings, we find *Barnes* to be inapposite. As we previously have noted, defense counsel in *Barnes* was prohibited from asking *any* questions concerning the topic of Christmas; see id., 337; and, thus, was completely precluded from uncovering any emotional attachment a prospective juror may have had toward Christmas. Moreover, in light of the unlimited nature of the trial court's limitation on voir dire questioning in *Barnes*, there was no other line of questioning that defense counsel could have pursued to uncover potential juror bias without violating the court's ruling.

In the present case, defense counsel could have asked each prospective juror about gangs in general, including whether he knew any gang members, whether he or members of his family were members of a gang and, if so, which gang. Furthermore, defense counsel was not precluded from asking prospective jurors whether their views on gangs would affect their ability to judge the defendant impartially. Consequently, defense counsel could have uncovered a prospective juror's association with the Latin Kings, or favoritism toward the Latin Kings, by asking questions concerning gangs in general inasmuch as we find it inconceivable that a prospective juror's answers to this line of questioning would vary from answers to questions specifically concerning the Latin Kings. Therefore, we believe that the defendant in the present case, unlike the defendants in *Barnes*, was afforded ample opportunity to uncover each prospective juror's predisposition toward gangs. Accordingly, we cannot conclude that the trial court's limited restriction on the scope of voir dire questioning in the present case infringed on the defendant's rights in the same manner as the court's much broader restriction did in *Barnes*.

In *Strain*, the Illinois Supreme Court upheld the
reversal of the conviction of the defendant, Terrance
Strain, because the trial court had declined to ask pro-
spective jurors,[15] despite defense counsel's specific
request, whether they would find Strain less credible
if they had learned that he belonged to a gang. *People*
v. *Strain*, supra, 194 Ill. 2d 471–72, 481. Prior to defense
counsel's request, the trial court had asked each pro-
spective juror "whether the juror, any member of the
juror's family or a close friend of the juror had ever
been involved in a gang." Id., 470. Thereafter, the trial
court declined to ask the specific question requested
by defense counsel even though the court recognized
that there would be evidence of gang involvement intro-
duced at trial. See id., 471–73. The Illinois Supreme
Court affirmed the reversal of Strain's conviction after
concluding that the trial court had abused its discretion
in declining to ask prospective jurors the question pro-
posed by defense counsel. Id., 481. The Illinois Supreme
Court reasoned that "[a] juror might well answer a
question regarding gang involvement in the negative,
while harboring an opinion of gang members that would
affect his ability to weigh the evidence fairly and impar-
tially." Id., 474. Thus, the court held that "when testi-
mony regarding gang membership and gang-related
activity is to be an integral part of the defendant's trial,
the defendant must be afforded an opportunity to ques-
tion the prospective jurors . . . concerning gang bias."
Id., 477.

Similarly, we previously have stated that "[w]hen
important testimony is anticipated from certain wit-
nesses whose official or semi-official status is such that
a juror might reasonably be more, or less, inclined to
credit their testimony, a query as to whether a juror
would have such an inclination should be permitted."

---

[15] It is the practice in Illinois to have trial judges ask the questions during
voir dire examination. Illinois Supreme Court Rule 431 (criminal cases).

*State* v. *Hill*, 196 Conn. 667, 672, 495 A.2d 699 (1985); accord *State* v. *Rogers*, supra, 197 Conn. 318–19. Accordingly, we held, in both *Hill* and *Rogers*, that a "trial court's refusal to allow defense counsel to ask prospective jurors whether they would be inclined to give more weight to the testimony of a police officer merely because of that person's official status constituted an abuse of discretion." *State* v. *Hill*, supra, 673; accord *State* v. *Rogers*, supra, 319.

On the basis of the facts of the present case, we are not faced with the same concerns that existed in any of the aforementioned cases. In each of the aforementioned cases, defense counsel was completely prohibited from ascertaining during voir dire examination whether a prospective juror objectively could weigh the testimony of either the defendant or an important witness testifying against the defendant. A defendant's rights to a trial by an impartial jury and to challenge jurors peremptorily, therefore, were unduly restricted by the limitations that the trial court in each case had placed on defense counsel in questioning prospective jurors. In the present case, however, defense counsel was not precluded from asking prospective jurors whether their views on gangs generally would affect their ability to judge the defendant objectively. In fact, defense counsel did inquire, without objection, about whether an indication of gang membership would affect the juror and whether that juror could deal with gang members in the same manner as anyone else. In view of the fact that these questions enabled defense counsel to determine whether the prospect of gang involvement would impact on the juror's objectivity in judging the defendant, defense counsel was afforded an opportunity to inquire into the specific areas into which defense counsel in *Strain* specifically was precluded from inquiring. Thus, the cases on which the defendant relies do not support his claim.

We reiterate that "[t]he trial court has broad discretion to determine the latitude and the nature of the questioning that is reasonably necessary to search out potential prejudices of the jurors." *State* v. *Skipper*, supra, 228 Conn. 627. Although the trial court's limitation on questioning specific to the Latin Kings may have pressed the outer limits of that discretion, in light of the substantial deference afforded to trial courts in the area of voir dire questioning, we cannot conclude that the court's ruling in the present case constituted a clear abuse of discretion. We note further that we do not look at the restricted question in isolation to determine whether there has been an abuse of discretion. Instead, we focus on "the context of the entire voir dire to determine whether the defendant was afforded a sufficient opportunity to expose" any predisposition that would undermine the prospective juror's objectivity. *State* v. *Smith*, 222 Conn. 1, 7, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992). Having already determined that questions concerning gangs in general were sufficient to uncover juror bias for or against the Latin Kings, we conclude that defense counsel was afforded such an opportunity in this case. Furthermore, it was reasonable for the trial court to conclude that questions specifically concerning the Latin Kings would improperly have afforded defense counsel an opportunity to gauge how each prospective juror would view his defense. Accordingly, we do not find any impropriety in the trial court's decision to preclude defense counsel from asking the prospective jurors specific questions concerning the Latin Kings.[16]

[16] The dissent mischaracterizes both the premise of our analysis and the proper inquiry for determining whether the trial court abused its discretion in this case. First, the dissent states that "[t]he premise of the majority opinion is that, because [defense counsel] was not precluded from asking questions about gangs in general, if [defense counsel] had done so and had elicited a response indicating that a venireperson had a bias for or against gangs in general, he then would have been permitted by the trial court to ask about the Latin Kings specifically. I question this reading of the record." It appears that the dissent is referring to that portion of the majority opinion

## II

### The defendant next claims that the trial court improperly declined to allow him to present evidence to refute

in which we state: "In the present case, defense counsel could have asked each prospective juror about gangs in general, including whether he knew any gang members, whether he or members of his family were members of a gang and, if so, which gang. Furthermore, defense counsel was not precluded from asking prospective jurors whether their views on gangs would affect their ability to judge the defendant impartially." It is therefore confusing as to how the dissent comes to its conclusion. It is worth reiterating, in an effort to clarify any ambiguity created by the dissent, that, on the basis of our reading of the record, the trial court did not preclude defense counsel from asking questions about gangs in general but, rather, precluded defense counsel from asking specific questions about the Latin Kings. Accordingly, defense counsel could have asked any questions about gangs in general, including: (1) "Do you have any thoughts or feelings regarding gangs?" (2) "Have you had any past experiences with gangs?" (3) "Are you a member of a gang?" (4) "Do you have any relatives who are members of a gang?" If the prospective juror had answered affirmatively to any of these questions, defense counsel could have asked, "Which gang?" This follow-up question is not a *question* that specifically concerns the Latin Kings, as the dissent suggests. Such a question might elicit a *response* concerning the Latin Kings, but that is not the pertinent inquiry. The pertinent inquiry is whether the trial court's decision to preclude defense counsel from asking *questions* concerning the Latin Kings was an abuse of discretion. As we already have discussed in this opinion, the fact that questioning concerning gangs in general could tend to elicit information regarding a prospective juror's involvement with the Latin Kings strongly militates in favor of our determination on appeal that the trial court did not abuse its discretion under the circumstances of the present case.

In addition, the dissent erroneously concludes that, even if a prospective juror were presented with questions about gang association or gang familiarity in general, that person would not necessarily respond with information about his or her specific biases for or against the Latin Kings. If defense counsel asks a prospective juror, "Do you have any biases for or against gangs," and the prospective juror harbors a bias for or against the Latin Kings, the prospective juror must answer that question affirmatively. Defense counsel then could follow up by asking that prospective juror, "Which gang or gangs do you have a bias for or against?" Neither of the foregoing *questions* concerns the Latin Kings specifically, and, thus, as the dissent concedes, defense counsel was not precluded from asking them on the basis of the trial court's ruling.

Finally, any contention that the trial court did not make its ruling clear to defense counsel evinces a complete misreading of the record and ignores the means by which a reviewing court determines whether a trial court has

the consciousness of guilt inference that had arisen from his conduct in preparing to leave Connecticut the day after the shooting, in violation of his right to a fair trial.[17] The defendant argues that because the state claimed, and the jury was instructed, that the defendant's conduct in preparing to leave Connecticut was indicative of a consciousness of guilt, he should have been allowed to testify about a conversation in which he allegedly was warned to leave the area for his own safety. According to the defendant, testimony regarding that conversation would have refuted the inference of consciousness of guilt, and, thus, the defendant maintains, the trial court deprived him of his right to a fair trial by declining to allow him to testify about that conversation. In addition, the defendant claims that the trial court improperly weighted in favor of the state its instruction to the jury regarding the inferences to be drawn from the evidence of flight. We agree with the defendant that he should have been permitted to introduce evidence to refute consciousness of guilt evidence but nonetheless conclude that the trial court's error was harmless. Furthermore, we find no error in the trial court's instructions regarding the inferences to be drawn from the evidence of flight.

abused its discretion. First, when reviewing the action of a trial court under an abuse of discretion standard, we should read the record "to support, rather than contradict, [the trial court's ruling]." *Matza* v. *Matza*, 226 Conn. 166, 187, 627 A.2d 414 (1993). Moreover, the trial court could not have been any clearer than when it informed defense counsel that it was "not going to permit [him] to ask questions about the juror's knowledge of the Latin Kings or how [the juror] might react to the evidence. . . . So, you asked me if you're permitted to ask *that question*. The answer's no." (Emphasis added.) Accordingly, if defense counsel still was uncertain as to what questions were authorized, the onus was on him to request that the trial court clarify its ruling. The facts of this case simply do not support the dissent's conclusion that the trial court abused its discretion.

[17] The defendant's claim, in this instance, is purely evidentiary, and, therefore, we need not engage in any constitutional analysis regarding the defendant's right to a fair trial.

## A

The following additional facts are necessary to our resolution of this issue. During direct examination, the defendant testified that the reason he contemplated leaving Connecticut the day after the shooting was that he "was scared." To corroborate this theory, the defendant sought to testify about a telephone conversation he had had with Pires' father the morning after the shooting during which Pires' father purportedly suggested to the defendant that he should leave the area for his safety. The state objected to this testimony on hearsay grounds. Prior to ruling on the objection, the court excused the jury and afforded defense counsel an opportunity to question the defendant about the conversation. The defendant responded that Pires' father told him, "I don't know who you are and I don't know how you are involved in what happened up here but I suggest you leave. . . . Get away." The defendant then stated that he interpreted Pires' father's statement "to mean somebody was seriously hurt" and that, at that point, he "didn't think [the victim had] died." Defense counsel then claimed that the statement by Pires' father was being offered for a nonhearsay purpose, namely, to show its effect on the listener, i.e., the defendant, and not for the truth of what was said. The state's attorney responded that, in his view, the statement constituted irrelevant evidence in any event. The trial court thereafter sustained the objection of the state's attorney, agreeing that the statement by Pires' father was irrelevant.

We conclude that the trial court improperly sustained the state's objection to the admissibility of the statement by Pires' father. We repeatedly have stated that evidence is relevant if it "has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend

to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." *State v. Kelly*, 256 Conn. 23, 54, 770 A.2d 908 (2001); see also Conn. Code Evid. § 4-1 (" '[r]elevant evidence' [is] evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence"). Because the statement about which the defendant sought to testify reasonably supported the defendant's theory that his plans to leave Connecticut were motivated by fear rather than consciousness of guilt, the statement was relevant on the subject of flight and, therefore, admissible. Cf. *State v. Kelly*, supra, 55.

Our determination that the trial court improperly excluded the statement of Pires' father does not end our inquiry, however. We still must determine whether the trial court's ruling was harmful. "Stated another way, the question is whether the claimed erroneous action of the court would have been likely to affect the result." (Internal quotation marks omitted.) *State v. Ruth*, 181 Conn. 187, 196, 435 A.2d 3 (1980). Because the trial court's ruling resulted in the exclusion of evidence of the defendant's state of mind when he was preparing to leave Connecticut, the issue of whether the court's improper ruling was harmful must be resolved in light of all of the evidence concerning that issue that was admitted at trial. See, e.g., *State v. Silveira*, 198 Conn. 454, 477, 503 A.2d 599 (1986).

Immediately following the trial court's decision to sustain the state's objection, and in the presence of the jury, defense counsel elicited the following relevant testimony from the defendant:

"Q. So, as result of *this conversation*, what did you do?

"A. I decided to leave. I started packing up my stuff . . . .

\* \* \*

"Q. Now, explain again, if you can, why you wanted to—why you were going to Pennsylvania.

"A. I knew something had happened and I just wanted to get away. That was—like my first instinct was just to run, you know, just leave.

\* \* \*

"Q. Okay. Who were you afraid of?

"A. I was just—I was afraid of—of basically the police, you know. I didn't—I wanted—I didn't want the police to come and arrest me. *And because of what he said before that, I took it to mean, you know, there's a lot more Latin Kings in Bridgeport than there [are] in Newtown.*" (Emphasis added.)

At that point, the state's attorney objected, claiming that the defendant was testifying as to his conversation with Pires' father, evidence that the court previously had ruled inadmissible. The court did not sustain the objection of the state's attorney or strike the defendant's testimony but simply directed defense counsel to "[a]sk [the] next question."

Finally, during closing arguments, defense counsel argued in relevant part: "So what does [the defendant] do? [The defendant] is scared. He's saying stuff. He clearly, I think, knows he's in trouble. He's in trouble on a couple of counts. He's got a shooting incident up in Newtown. *Based upon a conversation, he decides— a phone conversation*—he decides he's gonna get out of state. He's going to go to Pennsylvania . . . . As far as he knows, he's also in trouble with the Latin Kings, who, according to him, are not an outfit to be trifled with. . . . And he was going away. I mean, there is no

doubt about that. Does that show a sort of conscious-ness of guilt? Well, yeah, in a way it does. It shows he knows he's in trouble [with] both the state and [with] people who could be a lot worse . . . ." (Emphasis added.)

We note that "[w]hen a trial error in a criminal case does not involve a constitutional violation, the burden is on the defendant to demonstrate the harmfulness of the court's error." (Internal quotation marks omitted.) *State* v. *Moody*, 214 Conn. 616, 629, 573 A.2d 716 (1990). In the present case, the defendant contends that he should have been allowed to testify about his conversa-tion with Pires' father in light of the fact that the state was permitted to introduce evidence of the defendant's plans for flight as evidence of the defendant's con-sciousness of guilt. In view of the defendant's testimony at trial concerning his motivation for leaving the state and in view of the fact that defense counsel referred to this motivation during closing arguments, the defendant actually presented his theory for flight to the jury. Therefore, "[i]n light of the additional evidence per-taining to the defendant's state of mind that was placed before the jury"; *State* v. *Silveira*, supra, 198 Conn. 479; we conclude that the trial court's improper evidentiary ruling was harmless.

B

As part of his claim of not receiving a fair trial, the defendant contends that the trial court improperly weighted its instruction to the jury regarding the infer-ence from the evidence of the defendant's plans for flight in favor of the state.[18] The trial court instructed

---

[18] The trial court instructed the jury in relevant part: "In any criminal trial, it is permissible for the state to show that conduct or statements by a defendant after the time of the alleged offense may fairly have been influ-enced by the criminal act, that is, the conduct or statement show[s] a consciousness of guilt. The defendant's conduct or statements after the alleged crime occurs might be offered because such conduct or statements tend to show a consciousness of guilt. It does not, however, raise a presump-tion of guilt.

the jury that, in any criminal trial, conduct or statements made by the defendant after the alleged offense may be indicative of a consciousness of guilt. Notwithstanding this instruction, the court emphasized to the jury that any conduct or statement does not raise a presumption of guilt. The court then briefly summarized the state's position regarding both the conduct of and statements made by the defendant following the shooting, and further instructed the jurors that it ultimately was their decision as to whether the defendant's conduct and statements reflected a consciousness of guilt.

We conclude that the trial court's instructions did not deprive the defendant of his right to a fair trial. We note that the trial court explicitly instructed the jury that the defendant's conduct or statements did not raise a presumption of guilt. See *State* v. *Groomes*, 232 Conn. 455, 472–74, 656 A.2d 646 (1995) (noting that court's instruction on flight did not create presumption of guilt in rejecting claim that instruction was improper because it did not include possible innocent inferences to be drawn from flight). In addition, we have held that a jury instruction addressing the possible inference of guilt to be drawn from a defendant's flight was not improper even when the trial court had failed to convey an innocent explanation for flight that actually was presented by the defendant. *State* v. *Freeney*, 228 Conn. 582, 593–94, 637 A.2d 1088 (1994). In *Freeney*, we con-

---

"In this case there is evidence that, after the encounter between [the defendant] and [the victim], [the defendant] entered the black automobile and repeatedly said, 'I can't believe I shot him,' 'I just killed him,' or similar words. There's also evidence that, after the alleged crime, [the defendant] dyed his hair, packed a bag with clothes, and planned to leave this state to go to Pennsylvania. The state claims that the aforementioned statements and conduct, along with other evidence, shows consciousness of guilt by [the defendant].

\* \* \*

"It is up to you as judges of the facts to decide whether statements or conduct of the defendant reflect[s] consciousness of guilt, and to consider such in your deliberations in conformity with these instructions."

cluded that, "[t]he fact that the evidence might support an innocent explanation as well as an inference of a consciousness of guilt does not make an instruction on flight erroneous. . . . Moreover, [t]he court [is] not required to enumerate all the possible innocent explanations offered by the defendant." (Citation omitted; internal quotation marks omitted.) Id., 594. Therefore, although the trial court's instruction on flight might have included a reference to the fact that other innocent reasons possibly existed to explain the defendant's actions in contemplating flight, we cannot conclude that it was improper for the court to have failed to charge the jury to that effect. See id.

### III

The defendant's final claim is that his rights under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution were violated when the trial court precluded him from cross-examining two of the state's witnesses regarding the reputation of the Latin Kings in Bridgeport. We disagree.

Certain additional facts are necessary to our resolution of this issue. During cross-examination of Barnett, who testified as a state's witness, defense counsel asked, "Could you tell me, generally, what the reputation of the Latin Kings is in the [city] of Bridgeport?" The state's attorney objected. Defense counsel then explained, outside the presence of the jury, that the reputation of the Latin Kings was important to demonstrate that the defendant did not arm himself with the intent to commit robbery but, rather, to protect himself from the victim, whom the defendant believed was a Latin King. According to defense counsel, it was only after Pires informed the defendant that the victim was a member of the Latin Kings that the defendant armed himself with the gun. Defense counsel argued, there-

fore, that Barnett's testimony regarding the Latin Kings was relevant to corroborate the defendant's defense theory. The trial court sustained the state's objection, noting that there was "an insufficient foundation to show that [the defendant knew] anything about the Latin Kings or anybody involved in the Latin Kings or that that had any effect on his state of mind. So, at this point, I don't see that it's relevant." Furthermore, in response to the contention that information concerning the fact that the victim represented to the defendant that he was a member of the Latin Kings had been introduced at the probable cause hearing, the trial court stated: "This is the trial. I did not preside at the [probable cause hearing]. I don't know what the testimony was there. At this point, there's no foundation for the— there's no foundation."[19]

Thereafter, the defendant testified that, after Pires had informed him that the victim was a member of the Latin Kings, he armed himself on the basis of his past encounters with the Latin Kings in Bridgeport. The defendant also testified that the Latin Kings were notorious for criminal behavior in Bridgeport and that when he armed himself, he had no intention of robbing anyone.

After the defendant testified, the state recalled Barnett as a rebuttal witness. Barnett, once again, testified about the events surrounding the moment that the defendant reached for the gun. On cross-examination of Barnett, defense counsel did not inquire into the reputation of the Latin Kings in Bridgeport.

The sixth amendment to the United States constitution "require[s] that criminal defendants be afforded a

[19] During cross-examination of Carleton, who also testified as a state's witness, defense counsel posed the same question concerning the reputation of the Latin Kings that he had posed to Barnett. The trial court sustained the state's objection, noting defense counsel's exception.

meaningful opportunity to present a complete defense. . . . The defendant's sixth amendment right, however, does not require the trial court to forgo completely restraints on the admissibility of evidence. . . . Generally, [a defendant] must comply with established rules of procedure and evidence in exercising his right to present a defense. . . . A defendant, therefore, may introduce only relevant evidence, and, if the proffered evidence is not relevant, its exclusion is proper and the defendant's right is not violated." (Citations omitted; internal quotation marks omitted.) *State* v. *Cerreta*, 260 Conn. 251, 260–61, 796 A.2d 1176 (2002).

"[I]t is well settled that questions of relevance are committed to the sound discretion of the trial court." *State* v. *Barletta*, 238 Conn. 313, 332, 680 A.2d 1284 (1996). Accordingly, "[u]pon review of a trial court's decision, we will set aside an evidentiary ruling only when there has been a clear abuse of discretion. . . . The trial court has wide discretion in determining . . . the scope of cross-examination and [e]very reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . . To establish an abuse of discretion, [the defendant] must show that the restrictions imposed upon [the] cross-examination were clearly prejudicial." (Citations omitted; internal quotation marks omitted.) *State* v. *Rolon*, 257 Conn. 156, 173, 777 A.2d 604 (2001).

On the basis of the record in the present case, we agree with the trial court that the defendant failed to lay a proper foundation when he questioned the state's witnesses on cross-examination regarding the reputation of the Latin Kings in Bridgeport. The defendant claims that the purpose of this line of questioning was to corroborate his defense theory that he lacked the requisite intent to commit the crime of attempted rob-

bery on the night of the shooting.[20] Accordingly, until the defendant had testified about this theory, which, at that point, he had not, any information concerning the reputation of the Latin Kings was irrelevant. Thus, the trial court properly sustained the objection of the state's attorney to this line of questioning.

Moreover, the defendant's argument does not accurately reflect the trial court's ruling in this case. The defendant contends that his right to present a defense was violated when the trial court precluded him from cross-examining certain of the state's witnesses about the reputation of the Latin Kings in Bridgeport. "This argument, however, reflects a fundamental misunderstanding of the trial court's ruling. The trial court concluded only that the defendant had not . . . *yet* laid the proper foundation for such cross-examination; at no time did the court indicate that [defense counsel] was prohibited from renewing that line of questioning at an appropriate time. Thus, the record is unambiguous that the ruling of the trial court was a preliminary one, subject to reconsideration if and when [defense counsel] established the relevance of the testimony that he sought to adduce from [the state's witnesses]." (Emphasis in original.) *State* v. *Barletta*, supra, 238 Conn. 332. Because defense counsel did not seek to ask the state's witnesses about the reputation of the Latin Kings after the defendant had testified regarding his defense theory, "we can conclude only that [defense counsel] chose not to pursue this line of inquiry." Id. Accordingly, there was no abuse of discretion.

---

[20] We note that the defendant states in his brief that defense counsel posed the questions to the state's witnesses "[i]n anticipation of his defense that he did not possess the [requisite] intent to commit a robbery . . . ." This statement supports our conclusion that testimony regarding the reputation of the Latin Kings would not have been relevant until the defendant presented this theory to the jury, which he had not done at the time he posed that line of questioning to the state's witnesses.

The judgment is affirmed.

In this opinion SULLIVAN, C. J., and VERTEFEU-ILLE, J., concurred.

BORDEN, J., with whom PALMER, J., joins, dissenting. I disagree with the majority's conclusion that the trial court's blanket preclusion of questions by the defendant on jury voir dire about the venirepersons' knowledge of the Latin Kings gang did not improperly restrict the scope of that voir dire. I therefore dissent, and would reverse the judgment of conviction. Because I would reverse the judgment of conviction, I do not reach the other issues raised by the defendant on appeal.

The defense presented by the defendant, Ruperto Lugo, was that, when he exited the automobile armed with a gun, he did so because Mary Pires, an occupant of the vehicle, had warned him that one member of the group of boys outside of the automobile, Jason Gowdy, who ultimately became the victim, was a member of the Latin Kings gang. The defendant testified that he had had prior run-ins with the Latin Kings in Bridgeport, and that two members of the Latin Kings had shot his best friend. Therefore, he testified, he armed himself based on that prior experience, and not because he had the intent to rob anyone.

I agree with the majority's statement of the standards applicable to voir dire questioning, and will not repeat them in full here. I also agree with the majority's reading of the record that the trial court's ruling did not preclude the defendant from asking questions about gangs in general, but prohibited questioning only with respect to the Latin Kings gang in particular. I would conclude, however, that the trial court abused its discretion in precluding that questioning.

The important inquiry was not, as the majority suggests, whether any venireperson would have a bias for or against gangs in general; the important inquiry, for purposes of voir dire, was whether any such person had any thoughts, feelings or prior experiences regarding the Latin Kings in particular. I therefore disagree with the majority's contention that any association with the Latin Kings, or favoritism toward them, necessarily would have been uncovered by questions about gangs in general. Asking about gangs in general is simply not the same as asking about a particular gang because specific biases regarding individual gangs are not fungible. Even if asked probing questions about gang association or familiarity in general, a venireperson would not necessarily respond with information about his or her specific biases with respect to the Latin Kings. In short, brief and limited questioning about a venireperson's specific knowledge or beliefs about the Latin Kings would be the most reasonable means of eliciting the information that the defendant was entitled to have in order to make intelligent decisions regarding peremptory challenges or challenges for cause.

It is undisputed that the evidence at the probable cause hearing, as well as the evidence ultimately adduced at trial, involved the claim of the defendant that his state of mind at the time of the crime was governed by his prior experience with the Latin Kings. Consequently, in order for the defendant to have sufficient information on which to base an intelligent decision of whether to exercise a peremptory challenge or request a challenge for cause, he was entitled to inquire, at least initially and briefly, about the relationship, if any, of any particular venireperson to the Latin Kings. For example, he was entitled to inquire whether the venirepersons had relatives who were members of the Latin Kings, whether they had any preconceived ideas— negative or positive—about the Latin Kings, and,

indeed, whether any venireperson may have been a member of that gang. In addition, he was entitled to inquire whether any venireperson had such strong feelings or ideas about the Latin Kings that he or she could not put them aside and evaluate the evidence fairly and impartially. Beyond these very general and preliminary questions, the court certainly could have exercised appropriate control over the questioning.

The premise of the majority opinion is that, because the defendant was not precluded from asking questions about gangs in general, if he had done so and had elicited a response indicating that a venireperson had a bias for or against gangs in general, he *then* would have been permitted by the trial court to ask about the Latin Kings specifically. I question this reading of the record. First, there is no indication, from the trial court's blanket preclusion of questions about the Latin Kings, that the court had this conditional scenario in mind. Second, if the court did have it in mind, that was never made clear to the defendant. Third, I see no valid purpose for requiring this kind of two step procedure, where the pertinent questions concerned the Latin Kings, and not gangs in general.

Finally, the majority endorses the trial court's view that permitting the defendant to ask questions about the Latin Kings would have permitted him to gauge in advance the venireperson's views concerning the evidence. It is true, as the majority correctly notes, that "[q]uestions addressed to prospective jurors involving assumptions or hypotheses concerning the evidence which may be offered at the trial . . . should be discouraged [because they often] . . . represent a calculated effort on the part of counsel to ascertain before the trial starts what the reaction of the [venireperson] will be to certain issues of fact or law or, at least, to implant in his mind a prejudice or prejudgment on those

issues." (Internal quotation marks omitted.) *State* v. *Pollitt*, 205 Conn. 61, 75, 530 A.2d 155 (1987).

The rule against asking questions concerning various potential states of the evidence does not automatically prohibit questions concerning undisputed facts that will be set forth at trial. If we were to read the principle that broadly, it would preclude virtually any type of useful voir dire question. Such questions always have *some* evidence in view—e.g., "Would you be inclined to believe the testimony of a police officer, just because she is a police officer?" Thus, in managing voir dire, the trial court is often faced with applying the principle in such a way that it gives due latitude to voir dire, without permitting that latitude to become simply an attempt to persuade the jury in advance or to give counsel an impermissible view of the venireperson's likely reaction to issues of fact or law. The central objective of voir dire, however, is to ascertain whether the venireperson has a predisposition concerning undisputed aspects of the case that could not be set aside, or that could form the basis of a peremptory challenge. Our cases make clear that voir dire must have sufficient latitude to allow for that to take place.

In fact, the trial court's failure to recognize the undisputed nature of the victim's purported membership in the Latin Kings was at the core of its ruling. The court stated to defense counsel: "[Y]ou asked one of these jurors about the Latin Kings. And I don't know that anyone connected to this case—with this case was a Latin King. I don't know whether that's relevant or whether that's appropriate and I can't know that until some evidence gets put on." Sensing the court's confusion about this undisputed aspect of the case, defense counsel explained to the court: "I think it is important that we ask that question. We've obviously all gone through a probable cause hearing. That [aspect of the case] clearly is going to come up [at trial]." Confronted

with the fact that the victim's purported membership in the Latin Kings was an undisputed aspect of the case, with citation to the probable cause hearing, the court simply responded: "Well, I didn't sit on the probable cause hearing and I don't know what the potential evidence is going to be . . . at trial."

Where, as in the present case, there was no indication that the defendant sought to presage hypothetical states of the evidence to gauge the jurors' reaction, and the probable cause hearing demonstrated that the victim's purported membership in the Latin Kings was an undisputed aspect of the case, I conclude that the trial court abused its discretion by prohibiting the defendant from uncovering significant biases for or against the Latin Kings that could have formed the basis of either a peremptory challenge or a challenge for cause. I therefore dissent.